Good morning everyone. And we'll call the first case on our list and it'll be the case of Daryl Williams and Howard Brooks v. Jani-King of Philadelphia, Inc. et al. Mr. Vanort? Yes, Your Honor. Did I get that right? Vanort. Vanort. But I'll take Vanort, too. Vanort. Okay. Mr. Vanort? May it please the Court. I'm Aaron Vanort and I represent the Jani-King defendants. I have reserved four minutes of time for rebuttal. That request to be granted. The key initial question in this case is whether Jani-King's franchisees are independent contractors or employees. And on that question, Pennsylvania law has clearly and consistently distinguished between direct, day-to-day supervisory control, which is evidence, relevant evidence of an employment relationship, and control over the end result or quality of a product, which is not relevant evidence. Plaintiffs in this case, however, relied on Jani-King's franchise quality controls to meet their burden of showing that common issues would predominate over individual ones under Rule 23b-3. Well, commonality is really not an issue here. In effect, you even conceded that in district court. We're really dealing with dominance. We're dealing with predominance. Commonality is really a non-issue in this case. If you can't meet predominance, it doesn't matter because you've got to meet all the standards. But we're not interested in commonality here. Yeah, we have focused on this appeal on predominance. And so we said, and the plaintiffs, as I said, relied on these quality controls to say that this is the relevant evidence that's going to show predominance. The district court agreed with them, and that was an error of Pennsylvania law. What Pennsylvania law are you hanging your hat on? You say Pennsylvania law, you emphasize that in your brief, but I'm not sure that I read your argument of Pennsylvania law the same way you do. The controlling statute here is the WPCL. It doesn't define, doesn't have a definition for what an employee is. You look elsewhere. And so you draw on everything, but it's quite clear from Pennsylvania cases that whether it's the WPCL, whether it's unemployment, whether it's vicarious liability, the common law test, they all go back and look at the same multi-factor test that has the common factors. And under that test, it's undisputed and everyone agrees that whether it's right to control or control, that's the predominant consideration. It's the dominant and most important factor. The question, though, is control over what? And what the plaintiffs relied on is control over the quality of the final product. But Pennsylvania has consistently said that's not the right kind of control. And the case that's most directly on point is the Muskowski case because it involved the Best Western Franchise. So it's a franchise case like here. Well, the Drexel Court, does that hold against you in your position that really because you're a franchisor, you can't be a control person as well? Our position is not that just being a franchisor is automatic either protection or qualification. And that's what Drexel held. It's neither automatic one way or the other. That's the direct holding out of Drexel. Drexel does not control this case for three different reasons. Number one, the controls at issue there, the court found they were so broad that they could control everything. Well, you control who you're sending clients to the franchisee here. Yes, Your Honor. There's no doubt that Jana King controls what is offered to them. Although the franchisees do have the ability to go and solicit their own business, and that's directly in the contract. It's section 4.21.2. It's in the appendix at 189. And so it's a contractual right of them to solicit their own work. And simply deciding what work is offered is not proof under Pennsylvania law of control because that's the CE case. There are lots of cases on this that we cited. You did cite a lot of cases. Yes. There's a lot of law on this. Which was the case you cited as your principal case? Muskowski. The best Western case, Your Honor. But you also have the FedEx case and the, what's he called, the Sherman case, which whacks pretty heavily against your position here that you're a franchisor and you can't get your feet wet because your controls are so widespread that they actually tell them how to do business. Both Sherman and FedEx, neither of those are franchise cases, Your Honor. Neither of them applied Muskowski and neither of them applied this distinction that I've drawn that Pennsylvania law recognizes between control over the end result and the product. They're relied upon by the appellee, though. Yes, they are. And what I'm saying, they do cite them. They don't involve franchises. They involve delivery drivers. And neither of them applies Muskowski in this distinction I'm drawing that is deeply rooted in Pennsylvania law. What about universal Amcam? Yes, Your Honor. Now, that is a key case in our factor. Supreme Court case, as a matter of fact. By Pennsylvania. Muskowski Superior Court case, big difference. Yes, it is controlled. You can quibble about intermediate courts, but you can't quibble about the Supreme Court. That just controls here. And what universal holds is that controls that are required either by a state or federal law don't count in determining control. And that's relevant here because a lot of these controls over quality and brand are required by the Lanham Act. It's incidental to registering and licensing a trademark. Universal said it's in the existence of the right to control. It's significant. You're right. And why don't you have, per the documentation, have the right to control? It's the right to control what? And what the cases say is that it's control over the day-to-day physical conduct. The manner in which the work is done, right? Yes, the manner in which you go about it. Not quality standards because, again, this is Best Western. And the plaintiff in Best Western, the Muskowski case, made exactly the same arguments here. They pointed to the franchise manual there. They said there are all of these programs of quality control. There are rules and regulations. There's training. There's the ability to fine. There's the ability to terminate if you don't do it. And here's the exact quote from that court. They said, that reflects an overly broad conception of what constitutes control. Can I ask you a question, though? I mean, we can quibble over whether Janney, through the agreement and manual, has the right to control the manner in which the work is done. But is it significant that Johnny or Janney, I don't remember. Jana King, Your Honor. Reserve the right to amend the procedures? Couldn't they give themselves the right? And I cited two other cases, Kurbatov and Coleman. It seems like a key element is whether the alleged employer has the right to do this. Now, again, whether currently you control the manner in which the work is done is one thing. But it seems to me that couldn't you amend everything and actually exercise that right? And how important is that? Your Honor, let me answer both parts of that. Number one, couldn't Jana King? And number two, how important is if it could? Number one, there are constraints on its ability to amend this to be consistent with this program, and that's directly in the tax governing amendment. And that is not at all what was at issue in Drexel, where it didn't require any amendment and where it already gave them control over everything. So number one, it is not an unlimited right to amend here. Number two, I haven't found any case that has rested employment and the right to control on something that isn't there now but exclusively that could be. I think that is a much lower factor than what's actually there now. But don't those cases say that it's really the key element is the right to control the work, even if it's not controlled? Your Honor, I agree that the cases, depending on the context, sometimes they emphasize right to control, sometimes they exercise actual control. The difference I don't think matters at all for this case. Because, again, the question is the right to control what? In here, the most directly relevant provision of this franchise agreement is section 4.19. It's at page 186 of the appendix. And it says that the franchisee, and I'm quoting, is responsible for choosing the times and method of providing the services. It places the control over day-to-day operations. Who does what when? What are you going to do today? Who is going to be here? It places that in the franchisee's hands. And the evidence in the record, and there's no dispute about this. This is 701 to 720. You're saying that when is more important than how? I'm saying that how in terms of who's going to do what today. That's the kind of direction. Day-to-day operational decisions and instructions is what the cases say is relevant. And there's no evidence of that here. Well, your oral mind reading, as to what the Pennsylvania Supreme Court would say is within the statute. And your adversaries rely on T. Giovanni pretty heavily. Right. And what's wrong with their position? Their position is that you are before us and saying that because you have to protect their goodwill and your trademarks and so forth, that you're impinging upon their ability to run their own business. And what is wrong with that theory? You have no protection just because you're a franchisor if your rules require so much of them that they are not free to operate the way they want to because you have these, which you say are just protecting your goodwill, but it also affects their business. Yeah. As between the two federal cases that have decided class certification for Janneking, one is T. Giovanni, which is Massachusetts. The other is Juarez, which is California. Massachusetts applies an ABC test, which is not at all the same as Pennsylvania. Well, we don't know what Pennsylvania is going to do with the statute. It's never been really pinned down one way or the other, has it? Well, Your Honor, there's no doubt that Pennsylvania is going to apply the same multi-factor test under the WPCL as everything else. There's no question about that, Your Honor. And the California test is also multi-factor. And so as between T. Giovanni and Juarez, Juarez is much more directly on point because it addressed the relevant factors. That's why here, but I've got to keep coming back to the same thing. Quality controls, even really invasive ones, are not the relevant evidence. That's the holding of Best Western. And it's not just there, but this court in the I.H. case, that's the initials of a juvenile. A very sad case, a foster child was killed under the care of his foster parents and then sued the agency on vicarious liability under Pennsylvania law. And this court recognized that there is no vicarious liability unless there's an employment master-servant relationship. And it went through the manuals for foster care, which are incredibly invasive. And it went through the visits, which were weekly. It went through calls, which were even more frequently. And it held, based on Muskowski, that looking at all of those very direct, incredibly invasive controls is asking the wrong question. It said the right question is, was the foster agency there directing what they were doing on a day-to-day basis? Because the answer to that was no. As a matter of law, there was no employment relationship. All right, how does all this translate into the certification question? Your Honor, this court has often... Let's talk about that because that's why you're here. That's exactly why I'm here. It has often been the case in this circuit, and this court figured it out long before the Supreme Court held it in Dukes v. Walmart, that sometimes you have to look at the merits. And we've cited two cases, Unger, which is an antitrust case, and Hoheter v. UPS, which is an age discrimination case. In both those cases, the district court interpreted the elements of the substantive claim in a way that made common evidence relevant. This court took the appeal, and it disagreed on the interpretation of the elements. And it said under the correct substantive standard, the relevant evidence is not going to be common. It's going to be individual. And that's what's going on here because the plaintiffs have relied on evidence. The only common evidence they have are all these quality controls. If that's not relevant, and we say under Pennsylvania law there's direct holdings that it isn't, then the only evidence that's left on the thing that is relevant, which is day-to-day direction and supervisory control, the only evidence that's left is individual. It's the affidavits and the testimony. They haven't met their burden. And it is their burden. It's not a pleading standard. It's a burden of coming forward with evidence. And so this court would do exactly the same thing that it did in these other cases, and Unger and the UPS case, where it says no, under the correct interpretation of law, the relevant evidence is going to be individual. The Drexel court says that examples of operational control can be used in part to show that there's evidence of actual control. Your Honor, Drexel was decided in 1978. It was before Pennsylvania law, before the Best Western. It was before this decision in IH. And the court has gotten much more precise on the kind of controls that matter here. That doesn't mean that Drexel was wrong to decide it because it had such broad provisions giving control over everything, but I think you'd have to be wary of over-reading that case in terms of where the laws go. To answer Judge Fischer's question directly, though, you're really asking us to reverse the certification. We can't do anything about the individual case. You'll have to move the district court for summary judgment on that, but that's not before us. Absolutely. This court should not say who wins or loses, but this court can absolutely say what the elements are and what's required and what's relevant or not because to be common evidence, it has to be relevant. Actually, this question. Doesn't your argument as it relates to franchise agreements and franchises, if taken to its logical conclusion, if we accepted your argument, that individual evidence was needed, doesn't that basically say that franchises would be exempted from collective actions? No. Because how could there ever be a case where you could have common evidence predominate over individual evidence? It's entirely possible, Your Honor, for a franchise agreement on the right kind of control to have direct contractual evidence. For example, if it said, we, Jana King, reserve the right to direct you on a day-to-day basis. If that's in the contract, that's going to wipe everything out. That would be common evidence. Our argument is that you have to look at the right kind of control and what the documents say about that kind of control. Our position is just that in this case, what the documents say on the right kind of control is that it's in the hands of the franchisees. Then all the evidence from the actual practice backs that up, so there isn't any reason to think that anybody's fooling about that. All right, we'll have you back on rebuttal. Thank you, Your Honor. Ms. Liz Reardon? Yes, Your Honor. That's a mouthful. Even better than you did with Mr. Van Orn. Yes, I'm Shannon Liz Reardon. I represent the Punita Papelis with Ms. David Cohen. May it please the Court. The argument that you just heard from my brother counsel, he began with a statement of what this case is about that's before you that was absolutely incorrect. He began by stating that the question in here is whether these workers or employees are independent contractors. As Your Honor has recognized through the argument, the issue before you is whether the district court abused its discretion in certifying this case as a class action. Now, here, Janneke argues that. Well, it abused its discretion. If there are no elements of control under the statute, it abused its discretion because it didn't follow the law. So we're not just interested in abuse of discretion here. The fact is we have to decide whether the district court correctly interpreted the statute under which employment would be designated. Yes, that's correct. And don't you agree under that statute that there has to be some sort of control of the operation of the employees in order for there to be an employer-employee relationship? Well, the parties here have agreed for purposes of this appeal that there is a multi-factor test. Control is the predominant element. And as the cases have said, as Drexel, this Court said in Drexel, it is the right of control, not the exercise of control. And Janneke's argument is simply, well, you have to put aside control because they make a merits argument. The only reason we have any control is because we're a franchisor and thus need to protect our marks. You have to put aside the contract. And that is just utterly against the law. Well, you're putting the shoe on the other foot. You have to prove that there's an employee-employee relationship here. It's not their burden to prove that. It's your burden. And you have to show there's something in this record which shows that the franchisor controls the way you do the work. What in the record, including their ability to control the goodwill and the franchise trademarks, what in this record shows that they control how you do the work, even the work that they send to you? Yes, I will. So the control, and again, it's all in the contract. So it is common to everybody. And the contract includes, as we've set forth in our brief, training. The workers have to wear uniforms. Janneke and not the workers control the negotiations with the customers, and Janneke determines the pricing and Janneke determines the amount the workers are being paid. The workers do not negotiate this. Janneke makes surprise inspections. It also sets requirements for how much communication there must be between the workers and the customers. And most importantly in the contract, Janneke reserves the right to terminate in its discretion any franchisee worker who it determines has not met its quality standards. Also, significantly, even though the workers, Janneke says the workers can. For instance, that doesn't, they don't have the right to control whether or not you send your employees out at 8 o'clock or 10 o'clock in the morning. If you choose that it's more efficient to have your crew get somewhere at 10 o'clock and they do the work right, that's what the franchisor is interested in. Well, then maybe, Your Honor, we may lose on the merits one day. But the question before you, that's an argument they'll make on the merits. It's the same for everybody. They have the same rights vis-à-vis the franchisees for all of them as set forth in the contract. And again, Drexel says this court said it is the right to control, it's not the actual control. And I also want to point out that under Let's also look along that line there. I mean, I have a, you know, when you look at the size of some of the franchisees, some of your clients, you know, one has a couple of employees, another 27, another has 16, another doesn't have any, another has 6, another has 35, some have supervisors, some don't. Doesn't that size differential almost beg the question that you're going to have to have individual evidence to establish the control here? Your Honor, again, let's look at the factors that we will need to prove to prove employee status. And again, the question is whether it's the same for everyone. Now, Jana King has made the argument like we have seen in every independent contract or misclassification class action in recent years, that there are some of the workers have such big operations that they can't possibly be considered to be employees. Essentially, as Judge Wolf in Massachusetts said in granting summary judgment to the plaintiffs, finding them to be employees in a case that was certified, including on the control factor, that doing the work or getting people to do the work is the business of Jana King. So essentially, these so-called big franchisees are really managers. They're getting the people to come do the cleaning work, and all this money that Jana King says they're getting paid, they're not getting that money. Most of it is getting passed on to the workers who are doing the work. Those handful of large franchisees are essentially acting as managers. And what Jana King would have you say is that a class should not be certified here. There should not be the ability for these workers to challenge misclassification because there are a handful of people who have big operations. Now, what happened in the Massachusetts case where it was certified as a class action, a handful of these big operators opted out of the class because they didn't think this really applied to them. And they would, of course, have the option to do that in this case also. But to point to this handful of outliers as a reason not to certify these claims is not what the courts have done. In the FedEx case also. Who is your proposed class? Is the proposed class the person or the entity that has the franchise agreement, or is it that person plus all the people who work for them? No, no, no, not the people who work for them. Just like in Massachusetts what was certified is the people who have a contract with Jana King and do the work. So if some of these so-called big operators have a whole lot of people under them working but they're not doing the cleaning work themselves, that's not who we're talking about. And because a lot of these workers are immigrants, the way it works is that someone will sign the franchise agreement and they may have relatives help out with them. So when Jana King talks about people having employees, often their wife or their brother-in-law. So Charles Jones, who the record indicates is one of the franchisees, with 27 employees and five supervisors and brought in $1.2 million in 2009, you're saying Mr. Jones would not be a member of your class? Well, I'm saying if he did work himself, if he's out there scrubbing the floors himself along with the people who are working with him, then he would be and he's perhaps a manager of the people who are scrubbing the floors and he's not getting that whole $1.2 million himself. Most of that is going to people doing the work. Yeah, I understand. I understand. That's the way I hear it. But I'm saying that if he's doing the work, he would be part of the class. If he's just in a back office calling people in to do work and he's not actually scrubbing the floors himself, that's not who we're talking about. Who chooses these, for instance, to cleaning products? Who decides whether to use Windex or whether to use a Hoover vacuum or whatever it is? Is that up to the individuals or is that dictated from above? Well, that is a point, and again, common to everyone, that the workers supply the materials. So again, that might be a factor that weighs in favor of Janneking on the merits, but for cost eradication purposes, it's common. And I also really importantly want to point out is all this talk Janneking has made is about control and they want to have you set aside the entire agreement, which is not appropriate to do. But they, in their brief, don't even mention the secondary factors. So I just want to run through really quickly. Before you do that, you acknowledge, though, that as a franchisor, they are allowed to or permitted to have certain regulations enforced on you which protect their trademark and their goodwill. You acknowledge that, don't you? Yes, but under Pennsylvania law, just because they have a reason for why they exercise the control is not a defense. No, it's not control. It's regulations protecting their trademark and their goodwill, of which you signed on to as a franchisee. You acknowledge that they have that right, do you not? They have that right, but under Drexel, that does not mean that they're not employees. You can't say they have that right and then say they're employees because if that's your position, your position is that there's no such thing as a franchise relationship. Your position is that every franchise is an employee-employer relationship. Absolutely not. Under Drexel, just because you're a franchisor does not automatically make you not an employer nor does it automatically make you an employer. You have to look at the merits, both the control factors and the secondary factors. Okay, so you're acknowledging that the franchisor is allowed to have regulations and what regulations are you conceding that they could have as a franchisor? Okay, let me just say, just because they may be allowed by some other statute to have regulations is not a defense. Under this statute, not some other statute. Excuse me, answer this question. What regulations are they allowed to have as a franchisor under this statute? I'm sorry, under which statute? The WPCL? Yes, yes. Well, the WPCL doesn't speak as to whether they're allowed to have control or not. It just says if they do have this right of control, they're employees. What regulations can they have, given this statute, which doesn't make your people employees of the franchisor? What regulations can they impose on the franchisee, which would not make you an employee of the franchisor? I apologize, Your Honor. I'm not understanding the question. My question can't be more simple. I'm asking you this. You're in a franchisor-franchisee relationship. Yes. As a franchisor, are they allowed to have certain regulations protecting their goodwill and their trademark, or are they not? Under other regulations. Yes, under federal law and under state law. Under federal law, but again, when you look under Pennsylvania law, just because they have an excuse, an explanation as to why they did that, that doesn't, it's not a defense to this prosecution. I ask you about that. I ask you, if you recognize that there is such a thing as the franchise or franchise relationship, which is not automatically an employer-employee relationship, what regulations are they allowed to have under that relationship and not be an employer of the franchisee? Well, it's a matter of degree, and if you look at this exact situation that's been raised in other states, in Massachusetts and Mississippi, the Enum case, the court said that simply because you have a reason for why you'd exercise this control, because you want to protect your goodwill, that doesn't automatically mean... Well, you're not telling me, you're not answering, I want to tell you something. I asked a very direct question. You're not answering my question as to what is a legitimate regulation that they can have, and that's the only... The reason I'm having trouble with your question... Because their position is that the regulations that they've imposed upon you are legitimate for the purpose of protecting their trademark, their trade name, and their goodwill, and that they have done nothing which controls the way you do the work as a franchisee. That's their position. Yes, I understand that's their position. Again, the question here is, whatever they did, right or wrong, is it common to everyone? And I also just want to point out... There's commonality here. Right. And is that predominant? Again, if you look at the secondary factors as well as the primary factors, I still submit they have not explained why common issues do not predominate. But also, I just want to answer a question that you had raised to my brother, counsel, before. You said, how do we know what the Pennsylvania Supreme Court would say the actual test is? And we have all submitted here that it's this multi-factor test. Actually, in a recent case that this court decided involving a company, Sleepy's, that was brought under an independent contract of misclassification, class action brought under New Jersey law. Everyone thought that New Jersey would follow a multi-factor test, but it had never gone to the New Jersey Supreme Court. This court certified that question just last year to the New Jersey Supreme Court. And to everyone's surprise, they came back and said, it's an ABC test, just like we have in Massachusetts. So again, that has not been determined definitively by the Pennsylvania Supreme Court in response to your question. But again, I point to, in Massachusetts as well as Mississippi, the courts have said that Janneking may very well be an employee, even if their reason for this control is because it's trying to protect its goodwill as a franchisor. And just by way of reference, I want to point out that the U.S. Department of Labor, in issuing recent guidelines last year determining who's an employee and who's an independent contractor under federal law, set forth this guidance in which it explicitly said that defendants in these cases often give some reason or justification for the control, such as that they're following some other regulations. They're following federal regulations. But that's not a defense to these classifications. It's just a justification. Well, they did. Janneking set forth in their brief nine categories of why the controls they were imposing upon you as a franchisee were necessary for the franchise relationship. And they categorized nine separate items in their brief. You didn't answer that at all. Not at all. There was one thing I saw. You didn't respond to their analysis at all as to why those nine regulations were necessary for a franchise-franchise relationship. Again, Your Honor, that goes to the merits. And we just were not here on the merits. And also we're saying that there's no reason for why you did it. No, no, no. We're not here on the merits. We're not here on the merits. But, you know, Supreme Court has said and we have said that in making this predominance determination, there may be a requirement to look at some of the merits issues. If I could just say one last thing. I see that my time has run out. No, your time might not be up yet. Answer my question. Oh, I'm sorry. No, you didn't even listen to my question. The question was, do you look at the merits? Yes, I do agree that courts have in more recent years. The obligation. Peaked at the merits is what we call it. No, more than peaked at the merits. But the point is that we believe we're going to win this case on the merits and that the defense and that will be an issue for a jury perhaps to determine whether the control is so strong as to make this an employee relationship. I understand that. I understand that. Again, the secondary factors, which I didn't have a chance to mention, which were not even mentioned in the brief. May I ask one thing before we get to the secondary issues? Yes. I asked your adversary about what place in our analysis should the ability for Janne King to be able to amend their procedures, to amend their manual to create new things. How does that fit in here? Is that part of our analysis? The fact that they could exercise, go over whatever threshold there is to exert control? Well, yes. The agreement gives Janne King complete control over everything, to terminate the franchisee, to change the terms of the agreement. And, again, you do look at the right to control. And their right to change the provisions in the contract is right to control. So, yes, I would say that the contract itself, it reserves all the rights to Janne King. We submit that it goes beyond even what Janne King would need to do to protect its marks. But, again, the question is whether this is a common issue. And I also want to point out that Janne King argues that we're trying to destroy franchising, that there will be no such thing as a franchise if we prevail in this case. It's just, it's simply not the case. As Judge Wolf recognized in the Massachusetts case, there's a difference between these cleaning franchise companies like Janne King and a franchise as we traditionally know it like McDonald's, which is much more involved in the details of the day-to-day work. And, again, that may be a question for the jury one day. But in Massachusetts, the courts have ruled that companies such as Janne King and Coverall are employees and franchising is still alive and well in Massachusetts. Let me ask you one question that does go to the merits. Excuse my question. But what exact violation of the wage payment collection law are you trying to prove? Improper deductions, improper wage deductions, which is what we prevailed on in Massachusetts. Improper what? Excuse me? Improper what? Wage deductions. They charge fees to the workers. They take deductions out of their pay. That's the claim that we're making. Okay. All right. Okay, because, yeah, all right. I just wanted to be reminded of that fact as we're looking, sort of peeking at the merits here. Which, again, as happened in Massachusetts, is determinable completely from, in a mechanical way, from the records. We got it straight from Janne King's records how much was deducted from the pay. Is there anything else on that? If I can just briefly point to the secondary factors, which they didn't mention at all, because all of the talk has been about control. If you go through each one of them, they're all common. The nature of the worker occupation, its cleaning, the skill required. There's no skill required. There's no previous work experience required. Whether one is engaged in a distinct occupation or business. Here the contract, the franchise agreement, has a non-compete provision, which means they're not allowed to be working for anyone else or even doing the work in their own capacity. And just like the Massachusetts Supreme Judicial Court said in the coverall case, the commissioner case that we have cited, even if they go get their own work, Janne King makes a big deal about how they can go find their own customers. Those customers become Janne King's customers, not the worker. Janne King determines how much the worker gets paid. Janne King even charges them fees even when they went out and found their own customers. So as the court, the SGC held in coverall in Massachusetts, the workers are wearing the hat of Janne King. They're not wearing the hat of their own independent business. And, again, that's common. Who supplies the tools? We concede the workers supply the tools, but, again, that's a common factor. Whether the payment is by the time or by the job, it's by the job. But, again, that's common for everybody. Whether the work is part of the regular business of the employer as the court in Massachusetts held, Janne King is a commercial cleaning business. All right. I think we understand you on the secondary factors. Okay. All right. Thank you. Thank you, Your Honor. Mr. Van Ork? Your Honor, the district court applied the wrong standard for the right kind of control and, therefore, looked at the wrong evidence. That's the basis for reversing the certification order. I just want to walk through quickly what the right kind is. First, to Your Honor's questions, Judge Cohen, the Pennsylvania Supreme Court in the universal AMCAM case held that controls that are required by either state or federal law, quote, may not be considered, end quote, are not probative, close quote, of the employment relationship question. So to the extent that controls are required to protect a trademark, as a matter of the Pennsylvania Supreme Court, they are not relevant. Number two, the kinds of controls that are not relevant, the Best Western case has already said, training, not relevant. Inspections, not relevant. Termination for failing to comply, not relevant. Branding, sure not relevant. What is relevant is day-to-day supervisory control, direct control. That comes out of the Pennsylvania Supreme Court in Green. It comes out of this Court's holding in IH. That's the kind of control that's relevant, and there is zero evidence in this record, zero common evidence of the right kind of control. That's why, at a minimum, because the district court got the standard wrong, its decision has to be vacated. Somebody has to apply the right standard to the evidence. We believe that it's appropriate, as this Court has done in Unger and the UPS case, that beyond just vacating, you should reverse and say no because it's clear. Plaintiffs had the chance to build their record on the right kind of control and didn't do it. They don't have the evidence. They haven't met the standard. So reversal is appropriate. I want to briefly address Massachusetts because it's come up so often. The DiGiovanni case was resolved on a prong that is not relevant under Pennsylvania. There's the ABC test that is unique to Massachusetts. The second one says that all the services have to be outside of the usual course of the business. And, of course, they're not is the way they interpret that in franchising. That was the basis for the decision. That is not the basis under Pennsylvania law. It has nothing to do with this case. Finally, counsel mentioned the prospect of certifying some of these issues to Pennsylvania Supreme Court. Under the local rules, it's Local Rule 110.1 of this Court. If they're going to move to certify, they had to do it in their opening brief. It's too late now. This Court has often applied Pennsylvania employment law. It has done so in the IH case. It's done so in the other cases you've cited. There's no reason for it not to do it here. And on the clear basis of the precedent here, it's got to be controlled. The question is what kind of control matters. And after recognizing that the Let's talk about the Pennsylvania certification. I mean, you not only cite this, you know, you're arguing Pennsylvania law here. And it appears to be, on one hand, it's clear, but there are enough cases that you can say that it maybe is not clear and we have to predict. But amicus has come in, amica has come in on your side, saying how important this is to the franchise industry. Maybe this is a case that we should seek the guidance of the Pennsylvania Supreme Court on this important question of Pennsylvania law. We don't need to have a motion to certify to do that. You understand. You can do it sua sponte. There's no doubt about it. You have that authority. From what I can tell from the procedures, it's not been used very often. It has not been. I mean, it has been used selectively. Yeah. And, you know, and your honors, if you go through and look at your case in IH applying Pennsylvania law on this point, and if you look at Best Western and Green and Universal Amcam from the Supreme Court, if you found that it was really that hard to figure out where they're going on this, then you can consider it. But, yeah, having read this, since the 1970s,  that is a business-to-business relationship, the core of which are these quality controls to make sure that no matter where customers go, no matter who is the actual owner there, it's always the same. And whether it's been covenants not to compete, whether it's been vicarious liability in employment, consistently, case after case after case, they have held that those controls are different than employment. They will not find that the very thing that makes a franchise a franchise, which is a business-to-business relationship with strict quality controls, is the thing that destroys it. And I don't think there's any need to certify it for them to know the answer to that question, Your Honor. You're pretty confident of your position, particularly in your position as petitioner on this 23-F. Your Honor, I'm not hired to come here and be doubtful about this. I understand that. If you have any other questions, I'd be happy to answer them. Otherwise, thank you very much. Okay. We thank counsel for your fine arguments in this case, and we'll take the matter under advisement.